FILED'07 NOV 14 11:10 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THOMAS SANTRIZOS,

        Plaintiff,

v.

EVERGREEN FEDERAL SAVINGS AND
LOAN ASSOCIATION, et al.,

        Defendants.

Civil No. 06-886-PA

OPINION AND ORDER

**PANNER, Judge.**

    Plaintiff Thomas Santrizos brings this action against defendants Evergreen Federal Savings and Loan Association (Evergreen), Enhance Funding Service, Ltd. (Enhance Funding), and Robert Moore, claiming violation of the federal Family Medical Leave Act (FMLA), wrongful discharge, and intentional infliction of severe emotional distress.

    Defendants move for summary judgment. I grant the motion.

## BACKGROUND

    The following background is taken from the parties' concise statements of facts and from depositions and exhibits submitted

1 - OPINION AND ORDER

by the parties. Because defendants are moving for summary judgment, the background is presented in the light most favorable to plaintiff.

Plaintiff first worked for Evergreen, which is based in Grants Pass, Oregon, from about 1974 to 1986. From 1986 to 1995, plaintiff worked for one of Evergreen's competitors. From 1995 to 2000, plaintiff worked at Leader Mortgage, which he had started. Leader Mortgage later merged with a larger bank. From 2000 to 2002, plaintiff worked as a managing consultant for a start-up mortgage group.

Evergreen offered mortgage loans using conservative underwriting guidelines. In 2002, Evergreen created defendant Enhance Funding as a wholly owned subsidiary to offer less conventional mortgage loans, such as V.A. loans and sub-prime loans. Brady Adams, president of Evergreen, talked to plaintiff about working for the new subsidiary, and in August 2002, plaintiff was hired as assistant vice president and manager for Enhance Funding. Plaintiff warned Adams that Enhance Funding might not be profitable for two years.

Plaintiff was told he would be reporting directly to defendant Robert Moore, a senior vice president for Evergreen in charge of Enhance Funding. Plaintiff was disappointed because he thought he would have "free rein" to manage Enhance Funding.

Moore knew plaintiff as a mortgage broker with a good reputation in the community. Plaintiff had been the mortgage

2 - OPINION AND ORDER

broker on loans for Moore's first and second houses.

When plaintiff was hired, he signed acknowledgments that he was an at-will employee. Plaintiff understood the concept of at-will employment.

Plaintiff was responsible for marketing and bringing loans to Enhance Funding. If plaintiff brought in a loan that met Evergreen's stricter standards, plaintiff was to refer the loan to Evergreen. Plaintiff understood this arrangement when he was hired.

Plaintiff worked at a branch office in Brookings while Moore decided on a location for Enhance Funding's office in Grants Pass. Evergreen created a makeshift office for Enhance Funding in a conference room at Evergreen's Grants Pass headquarters. After about three months, defendants gave plaintiff new furniture and equipment. Despite the improvements, plaintiff was upset because defendants did not consult him before furnishing the office. At the time, plaintiff didn't think that defendants were purposely trying to anger him, but plaintiff now believes that Moore excluded him from planning the office because of Moore's antipathy towards him and towards Enhance Funding.

Plaintiff initially worked with an experienced, skilled loan processor, but that person left Enhance Funding after a few months. Plaintiff considered a good loan processor to be crucial to Enhance Funding's success, but Moore told plaintiff that only "keystroke skills" were necessary.

3 - OPINION AND ORDER

Plaintiff received "a bunch" of applications for the position, and Evergreen interviewed several candidates. Moore decided to hire Melissa Kleiss, an Evergreen employee who lacked experience as a loan processor. When plaintiff complained Kleiss's qualifications, Moore responded, "that's my decision, get over it."

"Going from a loan processor that knew everything from A to Z to one who didn't know anything" was very stressful to plaintiff. Moore later gave plaintiff permission to terminate Kleiss. However, without notifying plaintiff, Moore transferred Kleiss back to Evergreen on the day that plaintiff had planned to terminate her. For several hours, plaintiff waited in vain for Kleiss to arrive at work. Plaintiff considered Moore's failure to tell him about the decision to transfer Kleiss to be outrageous conduct intended to cause plaintiff emotional distress.

In late 2002, plaintiff told Moore that he was suffering from severe depression and anxiety. Moore referred plaintiff to a counselor. Plaintiff kept Moore informed about his mental condition. Plaintiff states that in spring 2003, he told Adams about his psychological problems. At his deposition, however, Adams testified he was not aware that plaintiff was suffering from mental or emotional problems.

At some point, Moore told plaintiff not to interact with Evergreen loan officers, even though plaintiff was required to

4 - OPINION AND ORDER

refer loans that satisfied Evergreen's stricter requirements. According to Moore, Evergreen's loan officers had complained that plaintiff was bothering them and frequently asked them about the status of loans plaintiff had referred to Evergreen.

In mid-2003, plaintiff had a "little challenge" with Moore concerning the timely arrival of a loan check. When the check arrived in time, plaintiff brought the check to Moore and said, "Okay, ass wipe, here it is."

Plaintiff states that up to this point, he and Moore had a history of bantering "like men do . . . kidded about stuff, used a few profanity words now and then." Guest Dec., Ex. 1, at 19. On this occasion, however, Moore took offense, asking plaintiff, "What did you call me?" Plaintiff replied, "Ass wipe," and apologized. Plaintiff said to Moore, "I didn't mean to offend you. Are you having a bad day or something?" The next day, Moore still seemed upset about the incident. Plaintiff again apologized. He told Moore that he would never use that kind of language again, and said, "I don't know what your problem is, but I need to get out and do my job." Id.

Moore did not talk to plaintiff for several days. Plaintiff told Jeffery Hyde, an executive vice-president with Evergreen, about the incident. Hyde told plaintiff not to worry, and said he would talk to Moore. A day or two later, Moore told plaintiff, "Hey, Tom, that incident that happened, let's just forget about it and pretend it never happened." Id., at 20.

5  -   OPINION AND ORDER

From then on, Moore distanced himself from plaintiff. Plaintiff thought that Moore was trying to force him to leave Enhance Funding. Moore often criticized plaintiff's job performance, sometimes about Enhance Funding's failure to generate a profit, as well as "little side things." When plaintiff asked for additional employees, defendants did not provide any.

In June 2003, plaintiff was trying to secure a loan for the fiancé of the daughter of a member of Evergreen's Board of Directors. The fiancé did not respond to plaintiff's repeated requests to sign the loan documents.

With a deadline approaching, the board member's daughter complained about the failure to close the loan. Moore then berated plaintiff, and told him, "I don't care what it takes, how much it costs, whatever we have to do, get that loan closed." Guest Dec., Ex. 1, at 32. Moore took the loan file from plaintiff. By the end of the day, plaintiff received signed loan forms, although plaintiff did not know how the signatures had been obtained. While plaintiff was not asked to forge any signatures, he characterizes Moore's conduct as inappropriate and possibly illegal. Plaintiff did not report Moore's conduct to anyone.

In 2003, plaintiff asked Kleiss to take digital photographs of him during a lunch break. Kleiss agreed, but then apparently complained to Moore.

6 - OPINION AND ORDER

Moore summoned plaintiff into his office, and told plaintiff, "Don't say a word. I don't want to hear anything from you and I don't want you to say anything afterwards." Moore then warned plaintiff that his conduct with Kleiss could be construed as sexual harassment. No one else was in Moore's office, and Moore did not raise his voice. Plaintiff now believes that Moore admonished him with the intent to cause severe emotional distress.

Enhance Funding was not profitable overall, despite showing a profit during certain months. At the end of 2003, Enhance Funding had lost about $11,000 for the year, for a total loss of $47,000 since its inception. At the beginning of 2004, Adams, president of Evergreen and Enhance Funding, told plaintiff that Enhance Funding would need to break even or show a profit by mid-2004.

Starting in January 2004, Moore began to micro-manage plaintiff's work. He reviewed plaintiff's letters and signed off on promotional materials.

In January 2004, a secretary asked plaintiff whether he had been to a Hooters restaurant during a recent trip to Phoenix. Plaintiff told the secretary that he didn't go to places like Hooters. A few days later, Moore called plaintiff into his office and told plaintiff not to say a word. Apparently relying on a distorted version of the Hooters conversation, Moore told plaintiff that his conduct could be construed as sexual

7 - OPINION AND ORDER

harassment. No one else was present during Moore's lecture, and plaintiff doubted that anyone else could hear what Moore said to him.

In May 2004, plaintiff was delivering promotional materials to a home show where Enhance Funding had a booth. Plaintiff parked temporarily in a restricted spot so he could deliver the promotional materials. The director of the event asked plaintiff to move, and plaintiff said he would do so as soon as he had dropped off his materials. The next day, Moore told plaintiff that the director complained that plaintiff had insulted her. When plaintiff offered to call the director to clear up the misunderstanding, Moore said that he would call the director himself. When plaintiff later asked Moore what had happened, Moore told plaintiff to forget it.

Enhance Funding's May 2004 figures showed a year-to-date loss of more than $9,000. At an Executive Committee meeting on June 3, 2004, Adams, president of Evergreen and Enhance Funding, announced that he had decided to terminate plaintiff. Adams had been considering terminating plaintiff, but did not make the final decision until a few days before the June 3 meeting.

Adams testified that he decided to terminate plaintiff because of Enhance Funding's overall performance since its inception, culminating in its failure to break even by the end of May 2004. At an Executive Committee meeting on June 16, 2004,
/ / / /

8 -   OPINION AND ORDER

Adams announced that plaintiff's termination would be effective on June 30, 2004.

In June 2004, plaintiff was feeling so emotionally overwhelmed by events at Enhance Funding that he began to suffer from suicidal thoughts. On June 23, 2004, plaintiff visited a psychiatrist, Dr. Frederick Fried. After interviewing plaintiff, Dr. Fried gave plaintiff a note stating that plaintiff needed a thirty-day medical leave from work. Plaintiff submitted Dr. Fried's note to defendants' human resources director, Marianne Lexin.

Lexin told management personnel that plaintiff had requested a medical leave of absence. In response, Adams decided to move the effective date of plaintiff's termination from June 30, 2004 to June 24, 2004.

The next day, Moore telephoned plaintiff and told plaintiff that he was terminated. Moore said that plaintiff should retrieve his personal property by 5:00 p.m.

That afternoon, plaintiff talked to Lexin in her office for five or ten minutes. Plaintiff testified that Lexin was "very nice" to him. Lexin did not think that plaintiff was distraught or agitated.

Plaintiff went to Evergreen's bank offices to pick up his belongings. Evergreen's policy is to collect office keys from departing employees immediately because of banking regulations governing security and customer privacy.

9  -  OPINION AND ORDER

When plaintiff arrived at about 5:00 p.m., the door was locked. Moore opened the door for plaintiff and returned to his office without talking to plaintiff. Moore let plaintiff into the vault to retrieve personal documents. Before plaintiff left, he shook Moore's hand and told him, "Thanks for everything, Bob." After the termination, Enhance Funding gave plaintiff three months' severance pay, one week's vacation pay, and reimbursement for medical, dental, life, and disability coverage premiums for six months.

On July 7, 2004, Dr. Fried reported that plaintiff was troubled about his termination and suffered from low self-esteem and feelings of worthlessness. On July 27, 2004, Dr. Fried reported that he did not see plaintiff as being permanently disabled, and that plaintiff was feeling better about himself. On August 10, 2004, Dr. Fried reported that plaintiff was suffering from social phobia, which interfered with plaintiff's "daily routine, occupational functioning and social life." Later Dec., Ex. 4.

In late September 2004, plaintiff's insurer accepted plaintiff's claim for long-term disability benefits. Plaintiff testified at his deposition in June 2007 that he has not been employable since his termination in June 2004.

Plaintiff now contends that if defendants had granted his request for medical leave rather than terminating him, he would have dealt with his psychological problems and returned to work

10 - OPINION AND ORDER

at the end of the twelve-week leave period. Plaintiff had never been fired from a job before and to this day he has not recovered from it. Plaintiff contends that Enhance Funding would have been profitable from June 2004 forward if defendants had given him free rein and if Moore had not micro-managed his work.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The court should resolve reasonable doubts about the existence of an issue of material fact against the moving party. Id. at 631. The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. Id. at 630-31.

## DISCUSSION

### I. FMLA Claim

Plaintiff contends that defendants' denial of his request for medical leave violated FMLA. If FMLA applied, plaintiff would have been eligible for twelve weeks of medical leave, from

11 - OPINION AND ORDER

June 24, 2004, to September 25, 2004. Defendants respond that plaintiff cannot state a claim under FMLA because he could not return to work after the leave period.

The Ninth Circuit recognizes three types of claims under FMLA: interference claims, when an employer interferes with an employee's exercise of rights under FMLA, 29 U.S.C. § 2615(a)(1); retaliation claims, when an employer discriminates against an employee for instituting or participating in proceedings or inquiries under FMLA, 29 U.S.C. § 2615(b); and discrimination claims, when an employer discriminates against an employee for opposing any practice prohibited by FMLA, 29 U.S.C. § 2615(a)(2). Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001). Here, plaintiff brings an interference claim based on defendants' alleged denial of plaintiff's statutory rights to notice of FMLA leave, to take FMLA leave, and to be reinstated at the end of FMLA leave.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" FMLA. 29 U.S.C. § 2615(a)(1). To establish an interference claim under FMLA, a plaintiff must show that: (1) he exercised his rights under FMLA; (2) his employer subsequently engaged in conduct that tended to chill the exercise of the his FMLA rights; and (3) his employer's conduct was motivated by the exercise of his rights. See Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124-26 (9th Cir.

12 - OPINION AND ORDER

2001). In addition, the plaintiff must "'show prejudice as a result of [the FMLA] violation.'" Stewart v. Sears, Roebuck and Co., Civ. No. 04-428-HU, 2005 WL 545359, at *11 (Mar. 7, 2005) (quoting Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004)). A plaintiff shows prejudice if he can establish that the FMLA violation "'rendered him unable to exercise that right in a meaningful way, thereby causing injury.'" Id. (quoting Conoshenti, 364 F.3d at 143).

Defendants argue that plaintiff was unable to return to work at the end of the leave period, and therefore plaintiff was not prejudiced by defendants' alleged violations of FMLA. Defendants rely principally on Edgar v. JAC Products, Inc., 443 F.3d 501 (6th Cir. 2006).[1] In Edgar, the plaintiff took medical leave because she was suffering from high blood pressure and anxiety. The employer terminated the plaintiff while she was on medical leave, based on her alleged failure to provide timely medical certification. A few days after the plaintiff's termination, a psychiatrist found that the plaintiff was suffering from major depression and could not return to work until after the expiration of the 12-week leave period.

---

[1] The parties have not cited, and I have not found, a published Ninth Circuit decision addressing the FMLA issues decided in Edgar. Cf. Fiatoa v. Keala, 191 Fed. Appx. 551 (9th Cir. 2006) (unpublished disposition) (when an employee could not return to work until after leave expired, the employee had no claim under FMLA).

13 - OPINION AND ORDER

The Sixth Circuit affirmed the district court's grant of summary judgment for the defendant. The Sixth Circuit held that an employer's intent is not relevant to a FMLA interference claim because the issue is whether the employee was eligible for FMLA's benefits, regardless of the employer's intent. Id., 443 F.3d at 507. The court also held that FMLA is not a strict liability statute, so an employer is not liable for violating FMLA if the employer would have made the same decision regardless of the employee's requesting or taking FMLA leave. Id., 443 F.3d at 507-08. The Edgar court concluded, "Employees seeking relief under the entitlement theory [i.e., the interference theory] must therefore establish that the employer's violation caused them harm." Id. at 508 (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).

Plaintiff attempts to distinguish Edgar, noting that while the plaintiff in Edgar was first granted medical leave and terminated while she was on leave, here plaintiff was denied leave entirely. Plaintiff contends that defendants should have first granted leave and then decided whether termination was justified.

Plaintiff's distinction of Edgar is beside the point. The relevant fact common to this case and Edgar is the employee's inability to return to work at the end of the leave period. Because plaintiff would not have been able to return to work at the end of the leave period, denial of the leave did not harm

him. See Ragsdale, 553 U.S. at 90 (employee not prejudiced by employer's failure to give FMLA notice because employee had not shown "that she would have taken less leave or intermittent leave if she had received the required notice").

Plaintiff contends that he has shown a disputed issue of material fact regarding his ability to return to work. Plaintiff cites a statement from Dr. Fried's July 27, 2004 report: "I do not see [plaintiff] as a person who will be permanently disabled and believe with appropriate counseling that he can be returned to the work force and use his acquired skills appropriately."

Dr. Fried's statement is not sufficient to create an issue of fact. Plaintiff testified in June 2007 that from the day of his termination through to the day of his deposition, he was not employable. In September 2004, two days before plaintiff's FMLA leave would have expired, plaintiff's claim for long-term disability benefits was approved. To be eligible for long-term disability benefits, plaintiff had to establish that he was unable to perform all of the material and substantial duties of his occupation because of a disability. Dr. Fried's statement about a possible return to work unfortunately proved to be overly optimistic.[2] There is no issue of fact regarding plaintiff's ability to return to work.

---

[2] Dr. Fried was not plaintiff's only treating physician during the relevant time, and plaintiff did not think highly of Dr. Fried's competence. See Defts.' Reply at 6 n.4 (citing plaintiff's testimony that he stopped seeing Dr. Fried because Dr. Fried appeared to be suffering from dementia).

As an alternate ground for summary judgment, defendants contend that plaintiff was terminated for reasons independent of his request for leave. In similar circumstances, the Ninth Circuit has noted that while "the FMLA generally confers the right to reinstatement, an employer may still terminate an employee during her leave if the employer would have made the same decision had the employee not taken leave." Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1097 (9th Cir. 2007) (citing 29 U.S.C. § 2614(a); 29 C.F.R. § 825.216(a)(1)). Here, assuming that defendants changed the date of plaintiff's termination because he requested leave, defendants have shown that the decision to terminate plaintiff was made before and independently of plaintiff's request for medical leave.

Plaintiff argues that the termination itself exacerbated his medical problems, and that if he had not been terminated, he could have returned to work after a 12-week leave.

In Edgar, the Sixth Circuit rejected a similar argument, which the court described as the exacerbation theory of estoppel or tolling. I quote at length from Edgar's reasoning for rejecting this theory:

> We . . . conclude that the exacerbation theory is not a valid theory of liability under the FMLA and does not alter the analytical framework for deciding entitlement and retaliation claims thereunder. This conclusion follows . . . from the language of 29 C.F.R. § 825.214(b), the DOL regulation that dovetails with the [Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F.3d 775 (6th Cir. 1998)] line of cases. The regulation provides that an employee loses the right to reinstatement "[i]f the employee is unable to perform

16 -   OPINION AND ORDER

an essential function of the position *because of a physical or mental condition* . . . ." Id. (Emphasis added.)

As the italicized language indicates, the regulation focuses on whether a "physical or mental condition" prevents the employee from returning to work, not on the cause of that condition or, for that matter, whether that condition is the same one that forced the employee to take a medical leave in the first place. In sum, the FMLA--and the authoritative regulation interpreting it--is concerned not with how a serious physical or medical ailment occurred, but with whether that ailment precluded the employee from performing an essential function of his or her job at the end of the leave period.

Finally, policy and administrability concerns weigh against endorsing the exacerbation theory. The decisions in [Barry v. Wing Memorial Hospital, 142 F. Supp. 2d 161 (D. Mass. 2001); Shepherd v. Honda of America Manufacturing, Inc., 160 F. Supp. 2d 860 (S.D. Ohio 2001); and Chrisman v. Rapid-Line, Inc., 2005 WL 1460291 (W.D. Mich. June 21, 2005)] indicate that the exacerbation theory is especially likely to be invoked in cases where the plaintiff suffers from depression, anxiety, or a similar mental condition. Because the stress inherent in adverse employment decisions will tend to aggravate most forms of mental or emotional instability, an argument that summary judgment is precluded by factual disputes as to whether the actions of the employer worsened the employee's mental state and prevented the employee from resuming his or her position could become standard fare.

This same argument would likely apply to a number of physically infirm employees as well, since stress can adversely affect many of the common ailments from which they suffer, such as hypertension and heart disease. The exacerbation theory therefore strays from the straightforward inquiry required by Cehrs and the DOL regulation, which do not ask when an employee's condition arose or what caused that condition. See Barry, 142 F. Supp. 2d at 166 (observing that the FMLA "does not address the cause of an employee's injury"). For these reasons, the exacerbation theory is at odds with the FMLA as both this court and the Department of Labor have construed that statute. We therefore decline to adopt it in FMLA cases.

17 -   OPINION AND ORDER

Edgar, 443 F.3d at 516. I agree with the Sixth Circuit's rejection of the exacerbation theory. Defendants are entitled to summary judgment on plaintiff's FMLA claim.

## II. Wrongful Discharge Claim

"The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be 'wrongful.'" Moustachetti v. State, 319 Or. 319, 325, 877 P.2d 66, 69 (1994) (citation omitted). A plaintiff may base a wrongful discharge claim on an employer's interference with FMLA rights. See Washington v. Fort James Operating Co., 110 F. Supp. 2d 1325, 1334 (D. Or. 2000).

Here, plaintiff has not presented evidence from which a jury could find that defendants interfered with his rights under FMLA when they terminated him. Defendants are entitled to summary judgment on plaintiff's wrongful discharge claim.

## III. Intentional Infliction of Emotional Distress Claim

### A. Background

Plaintiff argues that there is evidence from which a jury could find Moore liable for intentional infliction of severe emotional distress. Plaintiff cites evidence that Moore micro-managed his work at Enhance Funding; twice falsely implied that plaintiff may have committed sexual harassment; failed to respond to plaintiff's complaints about working conditions and lack of assistance; refused to allow plaintiff to terminate a problem employee; refused to allow plaintiff to interact with other loan

18 - OPINION AND ORDER

officers; refused to communicate with plaintiff; interfered with plaintiff's duties and performance; and terminated plaintiff.

B. **Discussion**

To prove a claim for intentional infliction of severe emotional distress, a plaintiff must show that

> (1) defendant intended to inflict severe emotional distress on plaintiff, (2) defendant's acts did in fact cause plaintiff to suffer severe emotional distress, and (3) defendant's acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct."

Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 626, 733 P.2d 430, 436 (1987) (citations omitted). Socially intolerable conduct is conduct that is extremely outrageous, not merely rude, tyrannical, churlish, or mean. Watte v. Edgar Maeyens, Jr., M.D., P.C., 112 Or. App. 234, 239, 828 P.2d 479, 481 (1992).

"Oregon appellate courts have been very hesitant to impose liability for IIED claims in employment settings, even in the face of serious employer misconduct." Robinson v. U.S. Bancorp, Civ. No. 99-1723-ST, 2000 WL 435468, at *8 (D. Or. Mar. 17, 2000), adopted by 2000 WL 33141063 (D. Or. April 20, 2000). Alleged misconduct found insufficient to support IIED claims includes making unreasonable demands on employees; terminating an employee for refusing to pull down his pants; accusing employees of being liars; and inconsistent and excessive supervision. See Zasada v. Gap, Inc., Civ. No. 05-1849-BR, 2007 WL 108935, at *3 (D. Or. Jan. 8, 2007).

19 - OPINION AND ORDER

Plaintiff argues that while none of the events considered separately may qualify as socially intolerable conduct, when considered in combination Moore's conduct is sufficient to support an IIED claim.

Moore's reprimands of plaintiff, whether justified or not, usually occurred when no others were present. Cf. Whelan v. Albertson's, Inc., 129 Or. App. 501, 505, 879 P.2d 888, 891 (1994) ("while taunts of "queer," and "Serge" might not be actionable in isolation, their repetition in the presence of customers and co-workers" could support an IIED claim). Although a jury could find that Moore was overly critical and hostile towards plaintiff, Moore's conduct was not "extremely outrageous."

## CONCLUSION

Defendants' motion for summary judgment (#20) is granted.

IT IS SO ORDERED.

DATED this __14__ day of November, 2007.

　　　　　　　　　_____
　　　　　　　　　OWEN M. PANNER
　　　　　　　　　United States District Judge

20 - OPINION AND ORDER